1

2

3

4

5

6

7



FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

**JAN 2 2 2014**

CENTRAL DISTRICT OF CALIFORNIA
BY _Sh__ DEPUTY

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10  DEBRA ANNE APPLEBY,                )  Case No. CV 13-02611 AN

11            Plaintiff,              )  MEMORANDUM AND ORDER

12       v.                           )

13  CAROLYN W. COLVIN, ACTING        )
    COMMISSIONER OF THE SOCIAL       )
14  SECURITY ADMINISTRATION,         )

15            Defendant.             )

16

17        Pursuant to the Court's Case Management Order, the parties have filed the

18  Administrative Record ("AR") and a Joint Stipulation ("JS") raising four disputed issues.

19  The parties have consented to proceed before the Magistrate Judge. The Court has

20  carefully reviewed the parties' respective contentions in conjunction with the AR. This

21  matter is now ready for decision.

22                                      **Issue #1**

23        The period at issue in this case is from January 1, 2003, Plaintiff's alleged onset

24  date of disability, to March 31, 2007, her date last insured ("DLI"). (AR 11, 14.) Plaintiff

25  contends the Administrative Law Judge ("ALJ") erred by issuing a "blanket ruling"

26  rejecting opinion evidence issued after Plaintiff's DLI. (JS 8-12, 18-20.) Specifically,

27  Plaintiff asserts the ALJ failed to consider properly the retrospective opinions

28  establishing disability from her treating doctors, Andrew Anthony, M.D., Peter Russell,

1  Ph.D., and Jane Fong, Ph.D. (JS 18; AR 14.)

2         Dr. Anthony became Plaintiff's primary care physician in 1997. (AR 413.)
3  Treatment records from the period at issue show that Plaintiff was diagnosed with a
4  variety of conditions, including depression, anxiety, stress, attention deficit disorder
5  ("ADD"), Raynaud's Syndrome,[1] and bilateral carpal tunnel syndrome. (AR 232-47,
6  434-39.) Dr. Anthony prescribed medication which helped keep Plaintiff's symptoms of
7  ADD under good control. (AR 244, 246, 435.) Although Plaintiff experienced
8  intermittent finger, hand and body pain, she was able to attend community college and
9  Dr. Anthony's reports reflect a generally well patient. (AR 14, 236, 241, 244, 247, 433-
10 35.) Despite these "unremarkable" findings, Dr. Anthony issued retrospective opinions
11 of disability several years after Plaintiff's DLI. (AR 14, 391, 522.) In August 2011, Dr.
12 Anthony wrote a one-paragraph letter addressed to "To Whom It May Concern," stating
13 that Plaintiff suffers from severe fibromyalgia and scleroderma, "is totally, permanently
14 disabled and should be afforded benefits due to her disability." (AR 391.) In February
15 2012, Dr. Anthony completed a medical source statement assessing significant functional
16 limitations. (AR 522.) Dr. Anthony gave Plaintiff a diagnosis of chronic pain and reflex
17 sympathetic dystrophy, and reported that Plaintiff had difficulty concentrating and severe
18 limitations in pushing and pulling with her upper and lower extremities. (AR 522.) Dr.
19 Anthony limited Plaintiff to lifting, carrying and pulling less than 10 pounds frequently
20 and 10 pounds occasionally, standing and walking less than 2 hours in an 8-hour
21 workday, and sitting less than 6 hours in an 8-hour workday. (AR 522.) Dr. Anthony
22 asserted that these limitations had existed for over 10 years. (AR 522.)

23        Plaintiff was referred to Dr. Fong for psychological treatment in June 2005. (AR
24 447-59.) Dr. Fong diagnosed major depressive disorder, recurrent, and recommended
25 participation in weekly individual therapy and supplements. (AR 454.) In September

26

27 _____

[1]  This medical condition affects circulation in Plaintiff's hands, and is referred to
28 in the record as "Raynaud's Syndrome," "Raynaud's phenomenon," and "Raynaud's
disease." The Court will refer to this condition as "Raynaud's Syndrome."

2005 and January 2006, Dr. Fong reported that the severity of Plaintiff's symptoms were improving and that she was gaining more insight and strength. (AR 447-48.) Plaintiff was able to attend school. (AR 448.) Dr. Fong assessed a Global Assessment of Functioning ("GAF") score of 65, indicating only mild symptoms, and a high score of 75 for the past year, indicating no more than slight impairment in social, occupational, or school functioning. (AR 447-48); *see* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM-IV") (a GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships" and a GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable  reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork")).[2] In May 2010, three years after Plaintiff's DLI, Dr. Fong wrote a letter to the Department of Social Services claiming that Plaintiff was "not able to work in the competitive labor market due to serious psychological problems (i.e., impairment in memory, decision-making, concentration and focus), and medical problems (i.e., unable to use her hands, chronic diffuse pain throughout her body, fatigue and limited physical strength)." (AR 334.) Dr. Fong reported that Plaintiff was suffering from major depressive disorder, attention deficit/hyperactivity disorder ("ADHD"), dependent personality disorder, Raynaud's Syndrome, scleroderma, chronic pain, and headaches. (AR 334.) Dr. Fong assessed Plaintiff with a GAF score of 48, indicating serious symptoms.[3] (AR 334); DSM-IV at 34.

---

[2]    Dr. Fong reported that she treated Plaintiff through August 2006, and resumed treatment in August 2009, which continued through May 2010. (AR 333.)

[3]    A GAF rating of 48 indicates: "serious symptoms (e.g., suicidal ideation, severe
(continued...)

Dr. Russell administered a neuropsychological evaluation of Plaintiff in 1996, more than six years prior to Plaintiff's alleged onset date. (AR 219-25.) Plaintiff's test results indicated moderately severe clinical depression, generalized anxiety, ADHD, and a personality problem. (AR 224-25.) Dr. Russell recommended group therapy and an ADD support group, and suggested Plaintiff consider continuing her education at a community college. (AR 225.) In September 2002, Plaintiff began the process of returning to college. (AR 484-85.) Due to her attention deficits, Dr. Russell recommended medication (Adderall). (AR 484-85.) In December 2002, Dr. Russell completed a verification of disability form for a disabled student program. (AR 483.) Dr. Russell indicated that Plaintiff would require additional time on exams, as she had problems with sustained attention affecting immediate memory. (AR 483.) Dr. Russell also noted that Plaintiff would have manipulation problems and would need a note taker for 12 to 18 months, as she was scheduled for carpal tunnel release surgery. (AR 483.) In January 2003, Dr. Russell completed a medical information form for the state disability insurance agency. (AR 481-82.) Dr. Russell reported that Plaintiff was being treated with psychotherapy and antidepressant medication for major depression and chronic pain. (AR 481.) When asked whether Plaintiff had been incapable of performing her regular work at any time during treatment, Dr. Russell responded "no." (AR 481.) Dr. Russell also reported, however, that Plaintiff's disability commenced on January 4, 2002, and that her disability was expected to end on June 30, 2003. (AR 481-82.) The record does not contain any additional treatment records from Dr. Russell during the relevant period. In January 2012, more than four years after Plaintiff's DLI, Dr. Russell completed a medical source statement (mental) for Plaintiff. (AR 470.) Dr. Russell stated that Plaintiff had moderate limitations in areas of understanding, memory, sustained concentration and pace, and adaptation, and marked limitations in social interaction. (AR

---

[3/] (...continued)
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

1    470.) Dr. Russell opined that these limitations had existed for ten years. (AR 470.)

2    The ALJ found the opinions of disability from Drs. Anthony, Fong, and Russell

3    were entitled to no probative weight, as they postdated the period at issue by several

4    years. (AR 14, 18, 334, 391, 470, 522.) In general, however, "medical evaluations made

5    after the expiration of a claimant's insured status are relevant to an evaluation of the

6    pre-expiration condition." *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988)

7    (explaining that medical reports should not be disregarded solely on the basis that they

8    are rendered retrospectively); *see also Turner v. Commissioner of Social Sec.*, 613 F.3d

9    1217, 1228-29 (9th Cir. 2010) ("While the ALJ must consider only impairments (and

10   limitations and restrictions therefrom) that [plaintiff] had prior to the DLI, evidence

11   post-dating the DLI is probative of [plaintiff's] pre-DLI disability."). But post-DLI

12   opinions may nonetheless be discounted if they are inconsistent with medical evidence

13   from the relevant period. *Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995).

14   Here, while the ALJ did cite the retrospective nature of the disability opinions

15   from Drs. Anthony, Fong, and Russell, the ALJ also provided specific, legitimate reasons

16   for rejecting these doctors' opinions. *See Lester v. Chater*, 81 F.3d 821, 831 (9th Cir.

17   1996) (if a treating or examining physician's opinion on disability is controverted, it can

18   be rejected only with specific and legitimate reasons supported by substantial evidence

19   in the record). The ALJ found that the opinions of Drs. Anthony, Fong, and Russell were

20   unsupported by the mild physical and mental findings of record, with respect to the

21   period at issue in this case.[4] (AR 14, 18); *see Thomas v. Barnhart*, 278 F.3d 947, 957

22   (9th Cir. 2002) ("[t]he ALJ need not accept the opinion of any physician, including a

23   treating physician, if that opinion is brief, conclusory, and inadequately supported by

24   clinical findings"); *see also Batson v. Commissioner of Social Security Administration*,

25   359 F.3d 1190, 1195 (9th Cir. 2004) (noting that "an ALJ may discredit treating

26   physicians' opinions that are conclusory, brief, and unsupported by the record as a

27   _____

28   [4]    Contrary to Plaintiff's contention, the ALJ's decision reflects that Dr. Fong's and Dr. Russell's post-DLI opinions were considered by the ALJ. (JS 19; AR 14.)

whole, ... or by objective medical findings"); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (same). For example, while Dr. Anthony's retrospective opinion asserts that Plaintiff's severe limitations in lifting, carrying, pushing, pulling, and sitting had existed for over 10 years, Dr. Anthony's progress reports during the relevant period did not reflect any significant limitations in Plaintiff's ability to function. (AR 14, 522); *see Johnson*, 60 F.3d at 1433 (finding that the ALJ properly discounted a physician's retrospective opinion because it contained no specific assessment of claimant's functional capacity prior to the DLI). And, although Dr. Anthony opined in August 2011 that Plaintiff should be awarded disability benefits due to fibromyalgia and scleroderma, his treatment records from the period at issue do not support the diagnosis of such conditions or opinion of disability. (AR 14, 232-47, 391, 434-39.)

Similarly, Dr. Fong's records during the relevant period indicate that Plaintiff was functioning fairly well with only mild to slight symptoms. (AR 14-15, 18, 447-48.) These findings conflict with her later opinion that Plaintiff was unable to work in the competitive labor market due to serious psychological and medical problems. (AR 14-15, 18, 334, 447-48.) To the extent the ALJ erred by failing to provide a detailed discussion of Dr. Fong's 2010 letter of disability, any error was harmless, as her conclusory opinion was not substantiated by the medical evidence. (AR 18); *Johnson*, 60 F.3d at 1433; *see Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991) (harmless error rule applies to review of administrative decisions regarding disability); *Stout v. Commissioner of Social Security*, 454 F.3d 1050, 1055 (9th Cir. 2006).

Likewise, Dr. Russell's brief treatment records fail to provide support for his retrospective opinion assessing marked limitations in social interaction, and moderate limitations in adaptation and understanding in his one-page, medical source statement from January 2012. (AR 14, 18, 219-25, 470, 481-85.) Moreover, any asserted error in rejecting Dr. Russell's opinion was harmless, as the ALJ accounted for the limitations assessed by Dr. Russell in Plaintiff's residual functional capacity ("RFC"), which included limitations to "simple, routine tasks" and no more than "occasional contact with

1   the public and coworkers." (AR 16); *see Stout*, 454 F.3d at 1055; *Curry*, 925 F.2d at

2   1131.

3        In sum, the ALJ was not required to accept the disability opinions expressed by

4   Drs. Anthony, Fong and Russell since their opinions were brief, conclusory and

5   inadequately supported by the record. *See Thomas*, 278 F.3d at 957; *Batson*, 359 F.3d

6   at 1195; *Tonapetyan*, 242 F.3d at 1149. The ALJ's decision to reject these doctors'

7   opinions of disability was supported by substantial evidence. *Lester*, 81 F.3d at 831.

8   Accordingly, Plaintiff is not entitled to reversal or remand on Issue #1.

9   **Issue #2**

10        Plaintiff contends the ALJ improperly rejected the opinions of several of

11   Plaintiff's examining and treating physicians without providing specific, legitimate

12   reasons for doing so. (JS at 20-27, 31-33.) The Court agrees with respect to the opinions

13   of two of Plaintiff's doctors, Mark Montgomery, M.D. and Daniel Ovadia, M.D.[5][6]

14        Dr. Montgomery, a hand and arm specialist and an agreed medical examiner in

15   Plaintiff's workers' compensation case, evaluated Plaintiff in September 2004. (AR 460-

16   67.) Dr. Montgomery diagnosed status post bilateral carpal tunnel releases with ulnar

17   nerve decompression at the wrist, bilateral mild cubital tunnel syndrome, bilateral

18   forearm tendinitis/tenosyvitis and Raynaud's Syndrome. (AR 466.) Dr. Montgomery

19   concluded Plaintiff was precluded from heavy lifting, repetitive or forceful gripping,

20   twisting, pushing, pulling or manipulating with either hand, and writing or keyboarding

21

22   [5]    The Court rejects Plaintiff's challenges to the ALJ's consideration of the disability

23   opinions of Drs. Anthony, Fong and Russell for the reasons discussed in Issue #1. (JS 22-27.)

24   [6]    The Court also rejects Plaintiff's contention that the ALJ improperly evaluated the opinion of Plaintiff's treating hand specialist, Michael J. Behrman, M.D. (JS 20.) In June

25   2003, Dr. Behrman recommended that Plaintiff undergo surgery for bilateral carpal tunnel release, and opined that Plaintiff was temporarily totally disabled. (AR 504.) Dr.

26   Behrman performed the release surgeries in October 2003 and March 2004, and declared Plaintiff permanent and stationary in August 2004. (AR 466, 505-08.) Dr. Behrman did

27   not provide any post-surgical assessment of Plaintiff's permanent restrictions. (JS 23.) The ALJ summarized Dr. Behrman's records in the decision, and noted that there were

28   no post-surgical complications. (AR 15, 18; JS 23.) The ALJ's consideration of Dr. Behrman's opinion is supported by substantial evidence.

more than 30 minutes per hour intermittently. (AR 467.) Dr. Montgomery estimated Plaintiff had lost 20 percent of the grip strength in her left, dominant hand and 40 percent of the grip strength in her right hand. (AR 466-67.)

In October 2004, Plaintiff was evaluated by Dr. Ovadia, an orthopedic specialist and a qualified medical examiner in Plaintiff's workers' compensation case. (AR 509-14.) Dr. Ovadia diagnosed status post bilateral carpal tunnel releases and Raynaud's Syndrome. (AR 512.) Dr. Ovadia opined that Plaintiff should be precluded from repetitive gripping, grasping, holding, torqueing, fingering, manipulation of the fingers, and other activities of comparable physical effort. (AR 512.) Dr. Ovadia estimated that Plaintiff had lost 25 percent of her grip strength in her left hand and 35 percent of her grip strength in her right hand. (AR 512.)

The ALJ summarized the work function limitations assessed by Dr. Montgomery and Dr. Ovadia, but failed to state any valid reasons for rejecting them. (JS 20-23, 31-33; AR 15, 18); *see Lester*, 81 F.3d at 831. For example, the ALJ noted that Dr. Montgomery did not preclude Plaintiff from performing "other work." (AR 15, 18.) However, Dr. Montgomery's failure to issue an opinion of total disability does not undermine his specific findings that Plaintiff is precluded from engaging in repetitive or strenuous handling and manipulative activities. (AR 18, 467.) The ALJ also noted that Dr. Montgomery and Dr. Ovadia recommended conservative treatment, consisting of vocational training, medication, and access to a hand specialist, but neither doctor recommended surgery. (AR 15, 18, 467, 513.) Plaintiff, however, had already undergone bilateral carpal tunnel release surgery with little change in her symptoms and had reached maximal medical improvement by the time she was evaluated by Dr. Montgomery and Dr. Ovadia. (AR 466, 512.) The ALJ did not identify any evidence establishing that Dr. Montgomery's and Dr. Ovadia's post-surgical treatment recommendations were unreasonable or otherwise conflicted with their assessment of Plaintiff's limitations. Thus, the relatively conservative treatment recommendations from these doctors does not qualify as a legitimate reason for rejecting their assessments of Plaintiff's work-related

1   limitations. *See Ritchotte v. Astrue*, 281 Fed. Appx. 757, 759 (9th Cir. 2008) (rejecting
2   the ALJ's conclusion that the claimant's treatment was too conservative where he had
3   surgery and the prognosis was guarded). Finally, the ALJ discounted Dr. Ovadia's
4   opinion because there was no evidence of a severe cervical impairment. (AR 15, 18.)
5   However, Dr. Ovadia did not diagnose a cervical condition or impose any restrictions
6   related to a cervical condition. The ALJ failed to explain how the finding of a non-severe
7   cervical impairment was in conflict with Dr. Ovadia's opinion. *Cotton v. Bowen*, 799
8   F.2d 1403, 1408 (9th Cir. 1986) (When an ALJ believes a physician's opinion is
9   unsupported by the objective medical evidence, the ALJ has a burden to "set[ ] out a
10  detailed and thorough summary of the facts and conflicting clinical evidence, stating his
11  interpretation thereof, and making findings."). Thus, the absence of a severe cervical
12  impairment is not a specific, legitimate reason for rejecting Dr. Ovadia's opinion.

13      The ALJ's decision to disregard the opinions of Dr. Montgomery and Dr. Ovadia
14  was not supported by substantial evidence. Accordingly, remand is warranted on Issue
15  #2.

16                                **Issue #3**

17      The ALJ found that Plaintiff suffered from the severe impairments of status post
18  bilateral carpal tunnel surgical releases and depressive disorder. (AR 13.) Plaintiff
19  contends the ALJ erred by failing to find ADD/ADHD and Raynaud's Syndrome among
20  her severe impairments. (JS 33-35, 37-39); *see Smolen v. Chater*, 80 F.3d 1273, 1290
21  (9th Cir. 1996) ("[a]n impairment or combination of impairments can be found 'not
22  severe' only if the evidence establishes a slight abnormality that has 'no more than a
23  minimal effect on an individual's ability to work.'" (quoting Social Security Ruling 85-
24  28)); *see also  Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (same).

25      The record shows that Plaintiff was diagnosed with ADD/ADHD during the
26  relevant period. (AR 14, 238, 241, 242, 244, 246, 247, 435, 440, 447, 448, 454, 483-85,
27  515.) The record also shows, however, that Plaintiff's ADD/ADHD responded well to
28  medication. (AR 14, 244, 246, 247, 372.) The ALJ did not err in relying upon this

1   evidence as a basis for finding Plaintiff's ADD/ADHD non-severe. *See Warre v. Comm'r*

2   *of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be

3   controlled effectively with medication are not disabling for the purpose of determining

4   eligibility for SSI benefits.") Put simply, there is no medical evidence contained in the

5   record that indicates Plaintiff's ADD/ADHD had "more than a minimal effect" on

6   Plaintiff's ability to work." *Smolen*, 80 F.3d at 1290; *Webb*, 433 F.3d at 687. But even

7   if the ALJ erred in finding Plaintiff's ADD/ADHD not severe, the error was harmless

8   because the ALJ accommodated the attention deficits Plaintiff might experience in the

9   work setting by including a limitation to "simple, routine tasks" in her RFC. (AR 16);

10  *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (concluding any error ALJ

11  committed at step two was harmless because the step was resolved in claimant's favor);

12  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

13          As for Plaintiff's Raynaud's Syndrome, the ALJ acknowledged that several of

14  Plaintiff's doctors diagnosed the condition. (AR 236, 242, 244, 438, 515.) While the ALJ

15  noted that Plaintiff's Raynaud's Syndrome was reported as stable on one occasion in

16  June 2003, the record also shows that Plaintiff was assessed with a work-related

17  limitation associated with Raynaud's Syndrome. (AR 14, 244, 513.) Dr. Ovadia

18  explained that Plaintiff's Raynaud's Syndrome was activated in 2002, when she had to

19  work in a colder environment, and that Plaintiff should be precluded from working in

20  refrigerated environments. (AR 14, 244, 512-13.) Dr. Ovadia also recommended that

21  Plaintiff be allowed access to continued treatment for her Raynaud's Syndrome. (AR

22  513.) In light of the medical evidence and the ALJ's improper rejection of Dr. Ovadia's

23  opinion, Plaintiff has satisfied her burden of establishing that Raynaud's Syndrome had

24  more than a de minimis impact on her ability to do basic work activities. *Smolen*, 80 F.2d

25  at 1290; *Webb*, 433 F.3d at 687. The Commissioner asserts that any error was harmless,

26  as the ALJ found that Plaintiff's severe impairments included status post bilateral carpal

27  tunnel surgical releases. (JS 36.) However, the ALJ did not include any of Plaintiff's

28  handling, manipulation, or work environment restrictions in Plaintiff's RFC. (AR 16.)

1   Therefore, the ALJ's error in finding Plaintiff's ADD/ADHD not severe cannot be

2   deemed harmless.

3         Accordingly, Plaintiff is entitled to remand on Issue #3.

4   **Issue #4**

5         Plaintiff contends the ALJ erred in assessing her RFC because it does not account

6   for the handling and manipulation restrictions assessed by Dr. Montgomery and Dr.

7   Ovadia. (JS 39-40, 43-44; AR 16.) The Court agrees. As discussed above, the ALJ

8   improperly rejected these examining physicians' opinions without providing specific,

9   legitimate reasons for doing so. As a result, the ALJ's RFC assessment and his step five

10  vocational determination are unsupported by substantial evidence.[7]

11        Accordingly, Plaintiff is entitled to remand on Issue #4.

12

13  **ORDER**

14        The decision whether to remand for further proceedings or order an immediate

15  award of benefits is within the district court's discretion. *Harman v. Apfel*, 211 F.3d

16  1172, 1175-78 (9th Cir. 2000). When no useful purpose would be served by further

17  administrative proceedings, or where the record has been fully developed, it is

18  appropriate to exercise this discretion to direct an immediate award of benefits. *Id.* at

19  1179 ("the decision of whether to remand for further proceedings turns upon the likely

20  utility of such proceedings"). But when there are outstanding issues that must be

21  resolved before a determination of disability can be made, and it is not clear from the

22  record the ALJ would be required to find the claimant disabled if all the evidence were

23  properly evaluated, remand is appropriate. *Id.*

24        The Court finds a remand is appropriate because there are unresolved issues that,

25

---

26     [7]    Plaintiff also challenges the ALJ's determination that Plaintiff was capable of

27  lifting and carrying 25 pounds frequently and 50 pounds occasionally because it is contradicted by Dr. Anthony's post-DLI opinion that Plaintiff is limited to lifting, carrying and pulling no more than 10 pounds. (JS 44, 522.) However, as discussed

28  above, the ALJ provided sufficient reasons for rejecting Dr. Anthony's conclusory opinion. Therefore, Plaintiff's argument is rejected.

when properly resolved, may ultimately still lead to a not disabled finding. *See INS v. Ventura*, 537 U.S. 12, 16, 123 S. Ct. 353 (2002) (upon reversal of administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotation marks and citation omitted). Accordingly, the present case is remanded for further proceedings consistent with this Memorandum and Order.

IT IS THEREFORE ORDERED that a judgment be entered reversing the Commissioner's final decision and remanding the case so the ALJ may make further findings consistent with this Memorandum and Order.

DATED: January 22, 2014

ARTHUR NAKAZATO
UNITED STATES MAGISTRATE JUDGE